Susanne J. REYNOLDS, et al., Plaintiffs,

v.

S & D FOODS, INC. f/k/a Consolidated Foods, Inc., a/k/a Consolidated Pet Food, Inc., et al., Defendants.

No. 91–1442–JTR.

United States District Court,
D. Kansas.

. July 24, 1995.

Randall E. Fisher, Wichita, KS, for plaintiffs.

Thomas W. Young, Amy S. Lemley, Foulston & Siefkin, Wichita, KS, for defendant.

## ORDER

REID, United States Magistrate Judge.

This case was tried to the court pursuant to 28 U.S.C. § 636(c). Following the trial, the parties have submitted their proposed findings of fact and conclusions of law. Pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

#### Jurisdiction and Venue

1. For the purposes of determining jurisdiction, plaintiffs are residents and citizens of the States of Kansas, California, Massachusetts, Pennsylvania, and Florida.

2. Defendant was incorporated in Colorado and has its principal place of business in Colorado.

3. The matter in controversy, exclusive of interest and costs, exceeds the sum of $50,000.

4. The transactions and events giving rise to this litigation arose in Kansas.

#### Consolidated Pet Foods, Inc.

5. At the Amarillo, Texas facility, Consolidated Pet Foods, Inc. (hereinafter "Consolidated") produced its 4–D meat product.

6. Unlike other companies in the 4–D meat industry, Consolidated told its customers that, unlike other companies in the industry, it tested batches of the 4–D meat (J. Mencin depo. at 15–16; R. at 1115–1116).

7. Larry Green, who sold Consolidated 4–D meat in Abilene, represented to plaintiffs Susanne Reynolds and Harland Olson that Consolidated tested its meat to make sure that the salmonella level was below a level harmful for greyhounds. Mr. Green never represented that the meat was completely free of salmonella (R. at 505–06, 1059–1060, 1115–1117).

8. Consolidated made no representations about its 4–D meat product in writing, and nothing on the labels of the product misrepresented its contents.

9. Consolidated's pet food product was marketed under the name BBB (Best Bet Brand).

10. Consolidated marketed BBB in Abilene, Kansas through a retail outlet known as The Greyhound Store.

11. Following the sale of Consolidated's greyhound division in late 1988 to National By–Products, the latter continued to operate The Greyhound Store under the same name.

12. Consolidated's BBB was sold as "farm meat" and "track meat." Farm meat

was sold under a green label and track meat was sold under a black label.

13. Consolidated's farm and track meat both came from 4–D meat, and both products were manufactured in Consolidated's Amarillo facility.

## 4–D Meat

14. 4–D meat is an acronym for dead, dying (also downed), disabled, and diseased cattle. It is usually made from cattle which die in feedlots, during transportation, or in the field. Consolidated also used chilled meats in barrels purchased from a corporate supplier.

15. 4–D meat is widely, if not universally, used in the greyhound industry as the main component in the diet of racing greyhounds. The plaintiffs knew of no one in the greyhound industry that runs dogs that are not fed 4–D meat. 4–D meat is used because of the belief in the industry that dogs run better when fed 4–D meat (R. at 51–53, 1035–1040).

16. Because of the source of 4–D meat, salmonella is commonly found in 4–D meat; only by cooking the meat can salmonella be eliminated (R. at 233–235; def. exh. # 26; F. Love depo. at 30–31, 33; C. Greene depo. at 124–125).

17. Susanne Reynolds recognized that there is a risk of salmonella by feeding her dogs 4–D meat (R. at 53). However, Ms. Reynolds and other greyhound owners feed 4–D meat to racing greyhounds despite the risk because dogs fed on 4–D meat run faster (R. at 495–497). Ms. Reynolds knew that 4–D meat may contain salmonella, and testified that the 4–D meat containing salmonella is not defective so long as the salmonella is at a low level (R. at 495, 497).

18. Ms. Reynolds was told by Larry Green that the 4–D meat had been tested for bacteria and salmonella to make sure that they were at a safe level (R. at 104–106).

## Quality Control

19. Dr. Fred Love, a veterinarian in Amarillo, Texas, believed that Consolidated operated a very clean and sanitary facility. They had a bacteriologist on duty who collected meat samples throughout the day and tested them for bacterial contamination. He was so impressed with Consolidated's exemplary operation that he and his wife began buying meat there for their own dogs (R. at 34–35).

20. Consolidated tested its 4–D meat product for moisture, fat, and protein levels, as well as for the presence and number of colonies of salmonella and other bacteria.

21. Julie Corbin, a lab technician at Consolidated during the relevant time period, could not verify that the meat from Consolidated's plant did not contain harmful amounts of salmonella or other bacteria (Corbin depo. at 21). However, she was not aware of any meat that ever left the plant which she had questions about (Corbin depo. at 38).

## Laurence "Larry" Green

22. Larry Green was the salesman for Consolidated who made contact with plaintiffs Reynolds and Olson when Consolidated began selling 4–D meat in Abilene. He is also the individual who allegedly told Ms. Reynolds and Mr. Olson that Consolidated was making a bad product and that Consolidated had received complaints about its 4–D meat product in other parts of the United States.

23. At the time Larry Green approached plaintiffs Reynolds and Olson on behalf of Consolidated, Mr. Reynolds and Mr. Olson had known Mr. Green for a number of years. Mr. Olson established a friendship with Mr. Green. Both Ms. Reynolds and Mr. Olson testified that they do not believe Mr. Green would knowingly sell a bad product to them.

## Susanne J. Reynolds

24. At the time Susanne Reynolds began feeding Consolidated's 4–D meat product in September 1988, she was an experienced greyhound owner, boarder, and trainer, having worked in the greyhound industry for approximately 10 years. Prior to entering

the greyhound industry, Ms. Reynolds operated a multi-breed AKC kennel.

25. In addition to her experience with canines, Ms. Reynolds has training as a nurse. Through her training as a nurse, Ms. Reynolds knew what Salmonella was, knew that it could cause illness in both humans and animals, and knew that it could be found in raw meat.

26. Ms. Reynolds feeds raw 4–D meat to greyhounds older than 4 months old, despite her knowledge that 4–D meat frequently contains Salmonella and that cooking the meat would kill the Salmonella.

27. In early 1988 when Larry Green stopped by Ms. Reynold's greyhound farm to market Consolidated's 4–D meat, Ms. Reynolds was feeding a 4–D meat produced and sold by Hereford By–Products. She had been feeding Hereford's 4–D meat off and on since 1985.

28. During Larry Green's initial visit to Ms. Reynold's greyhound farm in early 1988, he told Ms. Reynolds that Consolidated tested its 4–D meat product and that the meat was safe. However, he never represented to Susanne Reynolds that Consolidated's 4–D meat was completely free of Salmonella.

29. Mr. Green left some free samples for Ms. Reynolds during his initial call on her farm in early 1988, and Ms. Reynolds subsequently purchased some of Consolidated's products.

30. Ms. Reynolds did not like the texture and consistency of Consolidated's puppy formula and returned the products she had purchased. She resumed feeding Hereford By–Products 4–D meat, and did not become a Consolidated customer at that time. Consolidated issued an overpayment credit of $100.00 to Ms. Reynolds which she could redeem at The Greyhound Store in Abilene.

31. Ms. Reynolds did not begin feeding Consolidated's 4–D meat again until September 15, 1988, after Hereford By–Products announced that it was discontinuing its seven day delivery schedule in Abilene. Ms. Reynolds stored her 4–D meat in chest freezers, and her freezers would only hold a week's supply of meat. Thus, when Hereford stopped delivering meat once a week, Ms. Reynolds was forced to find another supply of meat. If Hereford had not changed its delivery schedule, Ms. Reynolds would not have switched to Consolidated. Moreover, Ms. Reynolds testified that she intended to switch back to Hereford's meat when it resumed its regular delivery schedule.

32. The Greyhound Store was conveniently located nearby and could be accessed by Ms. Reynolds anytime she needed meat for her greyhounds. Ms. Reynolds could also have purchased Monfort brand 4–D meat locally, but she did not like the cut of Monfort meat.

33. Ms. Reynolds claims to have vaccinated the greyhounds on a certain schedule.

34. Ms. Reynolds decided she was not going to change the diet of her racing dogs and fed Consolidated 4–D meat only to brood matrons, puppies, and dogs that were not racing. However, six brood females kept in the kennel for sick dogs were kept on the Hereford meat as well (R. at 110–113).

35. Ms. Reynolds did not notice anything wrong with the Consolidated meat (R. at 114). Within a day of feeding the brood females with Consolidated meat, some of the brood females began aborting their litters. Seven females aborted their litters within two weeks (R. at 115–118).

36. Some of the other dogs began to get kennel cough and other symptoms after Ms. Reynolds began feeding Consolidated to the dogs.

37. Ms. Reynolds took two of the dogs who were ill to the Abilene Animal Hospital. She was told the dogs had distemper and had to be destroyed (R. at 126–127).

38. Most of the dogs at Ms. Reynolds farm became ill the last part of October and the first part of November (R. at 130). Within one month prior to the outbreak of the disease, an entire litter of unvaccinated

puppies were brought to Ms. Reynolds farm. Within a few months of the outbreak of the sickness, dogs on her farm were returned to the farm from race tracks where they had contact with other dogs.

39. Not all of the dogs eating Consolidated meat became ill (R. at 555).

40. The dogs exhibited a variety of symptoms when they became sick.

41. Ms. Reynolds quit feeding Consolidated meat on or about October 25, 1988, after being told by Kansas State that salmonella was in the meat (R. at 144).

42. None of the dogs in the racing kennel became ill or died. These dogs did not eat the Consolidated meat.

43. The dogs that were ill were vaccinated for distemper at the instructions of Dr. Jordan, a veterinarian (R. at 461–62).

44. Representatives from Consolidated met with Ms. Reynolds. They indicated that they were having some problems with bad meat, and they picked up the Consolidated meat that she had not yet used (R. at 157–160).

### Harland "Mooch" Olson

45. Harland Olson began feeding Consolidated's 4–D meat to the greyhounds on his farm in February 1988.

46. While feeding Consolidated's 4–D meat product, Mr. Olson never noticed any "green" meat and never reported a load of "bad" meat. The same was true of Ms. Reynolds; she never bought a supply of "green" or foul smelling meat.

47. Mr. Olson feeds raw 4–D meat to greyhounds older than 3 months old, despite his knowledge that 4–D meat frequently contains salmonella and that cooking the meat would kill the salmonella.

48. Some of Mr. Olson's dogs became ill even though they were receiving only cooked meat (R. at 1132).

49. Mr. Olson fed Consolidated track or farm meat to all of his dogs. Mr. Olson's older or kennel dogs did not become sick (R. at 1125–1127).

50. One of the adult dogs of Mr. Olson that became ill arrived on the farm in October 1988. That dog had been at a race track and was thus in contact with other dogs (R. at 1127).

51. Mr. Olson was informed by Dr. Jordan, a veterinarian at Kansas State, that the dogs taken to Dr. Jordan for examination and testing had salmonella.

52. Mr. Olson maintained a vaccination program for his dogs.

53. Mr. Olson's dogs did not become ill until after he began feeding Consolidated 4–D meat.

54. The only greyhound from Mr. Olson's kennel which is in issue in this case, dog no. 62, became ill prior to being vaccinated for distemper (R. at 1143).

55. During the course of the disease epidemic on his farm, Mr. Olson stopped by the veterinary clinic of Dr. Kent Law and described the symptoms of the disease to Dr. Law. Dr. Law opined that the disease was distemper (R. at 1137).

56. As to dog # 62, the report from Kansas State indicated that while salmonella cannot be ruled out, the animal showed lesions of distemper (R. at 1138). In fact on all the dogs of Mr. Olson examined by Kansas State, distemper is mentioned (R. at 1139).

### Canine Distemper Virus

57. Distemper is a pathogenic, pantropic virus which affects all of a dog's tissues. It is universally documented as an immunosuppressive disease and is highly contagious, spreading from dog to dog or by hand-air contact.

58. Plaintiff's expert, Dr. Green, acknowledges that distemper has been documented as being a severe immunosuppressive virus and comments in his chapter on distemper that greyhounds are a breed of canines commonly and severely affected by distemper.

59. A clinical report from a veterinarian affiliated with Abilene Animal Hospital documented a severe case of distemper which killed 40% of the greyhound population on a greyhound farm boarding dogs that the veterinarian had personally vaccinated (R. at 247–254; Defendant's exh. # 18).

60. There are different strains of distemper, and a vaccination will not protect a dog against a new or mutant strain of the disease.

61. Distemper suppresses the immune system by depleting the cells which fight disease and by depressing cells which produce antibodies.

62. Although diarrhea and vomiting are not the first signs of distemper, they are often the first objective signs of distemper. Thus, a dog may appear to have just become sick when, in fact, the disease has infected the dog for several days.

63. Dr. Welch, after reviewing the videotape of Ms. Reynolds' sick dogs, stated to a reasonable degree of veterinary probability that the clinical signs and symptoms of Ms. Reynolds' dogs were evidence of distemper, and that salmonellosis was not the primary disease in the dogs (R. at 307).

64. Dogs will continue to show signs of distemper even after the virus has run its course because the lesions left in the dog's brain will continue to cause a central nervous system disturbance.

65. Carriers of distemper often do not show objective signs of the disease and make it almost impossible to trace the source of the disease.

### Salmonella

66. Salmonella is a bacteria comprised of at least 3,000 different serotypes. The pathogenicity of salmonella depends upon the serotype; thus, in an outbreak of salmonellosis, one would expect to find a single, pathogenic strain from a common source.

67. Salmonella is susceptible to heat processing and could have been eliminated from the 4–D meat by cooking the meat.

68. An infection of salmonellosis actually causes the white blood cells, which fight disease, to multiply.

69. The primary manifestation of salmonellosis is diarrhea. Vomiting and refusal to eat will sometimes also occur (R. at 238–240).

70. Salmonellosis is most commonly secondary to canine distemper; salmonellosis is most likely to occur with a debilitated or immunosuppressed animal (R. at 817–818; C. Greene depo. at 135).

71. Over 90% of dogs with clinical salmonellosis recover without any signs of damaging effects.

72. There are multiple means through which the greyhounds at issue could have ingested salmonella other than by eating Consolidated's 4–D meat. For instance, they could have ingested salmonella through the 4–D meat products they ate prior to eating Consolidated's meat; they could have ingested salmonella through the feces of other dogs; or, they could have ingested salmonella through drinking contaminated water.

### Kansas State University

73. Dr. Johna Veatch, a pathologist at Kansas State University indicated that while salmonella was present in the dogs in question, she could not say that salmonella played a significant factor in their death (Veatch depo. at 18). She stated that she could not say whether it was salmonella or distemper that was the cause of the dog's illness and death (Veatch depo. at 20–21).

74. The weight of the evidence is that distemper is clearly immunosuppressive, and could suppress a dog's immune system and allow salmonella to become invasive. The immunosuppressive qualities of salmonella has not been clearly established; the evidence is in dispute on this point. Dr. Cole opined that salmonella probably did not cause the dogs in question to catch canine distemper (Cole depo. at 61–62).

### Dr. Craig E. Greene

75. Dr. Greene is a veterinarian from the University of Georgia. He is certified in

veterinary internal medicine and neurology (Greene depo. at 3, 4).

76. In general, Dr. Greene indicated that he was unable to determine whether salmonellosis or distemper occurred first in the dogs in question (Greene depo. at 16). He found that both diseases seemed to be occurring in the dogs (Greene depo. at 81).

77. Dr. Greene did not observe any visual evidence of the symptoms of the dogs (Greene depo. at 17).

78. Dr. Greene stated that greyhounds who eat raw meat run a definite risk of contracting salmonella. He also cited a study which found that 44.64% of greyhounds who ate raw meat tested positive for salmonella (Greene depo. at 20, 21).

79. Dr. Greene made the following findings as to the various dogs: # 3—The disease process in this dog was caused by salmonella (Greene depo. at 34).

# 10—The diagnosis is that is was probably salmonellosis (Greene depo. at 39).

# 12—His final opinion is that salmonellosis and distemper were the cause of illness in this dog (Greene depo. at 45).

# 14—The disease process that led to the death of this dog were a combination of salmonellosis and canine distemper (Greene depo. at 59).

# 15—[Same as # 14] (Greene depo. at 61).

# 19—[Same as # 14]. The veterinarian further opined that it was more likely that the salmonella was responsible for the systemic manifestations (Greene depo. at 64–65).

# 22—[Same as # 14] (Greene depo. at 66).

# 40—The disease process that led to this dog's death was salmonellosis (Greene depo. at 69).

# 62—The probable cause of the disease process was a combination of salmonellosis and distemper (Greene depo. at 75).

80. Dr. Greene opined that the food was the likely source of salmonella in the dogs (Greene depo. at 90–91).

81. Dr. Greene also indicated that new dogs in a kennel could be a source of an outbreak of illness in the dogs (Greene depo. at 110–111).

82. Dr. Greene concluded that distemper was present in both the Reynolds and Olson kennels (Greene depo. at 112).

83. Dr. Greene recognized that there is no specific documentation in the literature of the immunosuppressive effects of salmonella (Greene depo. at 118).

84. Dr. Greene could not rule out that the source of salmonella with the dogs in this case could have been the meat used four to eight weeks previously (Greene depo. at 129).

85. Dr. Greene indicated that the systemic salmonella could be attributable to the dog's immune system being suppressed due to distemper (Greene depo. at 142).

86. Dr. Greene could not say that it was more probable than not that if a dog showed systemic indications of a certain disease, that the systemic disease was the cause of the dog's illness (Greene depo. at 151–152).

### Dr. Fred Love

87. Dr. Fred Love is a practicing veterinarian. His practice is primarily with small animals, approximately 85% of which are dogs. Dr. Love has had over 33 years experience in diagnosing and treating distemper.

88. Dr. Love and his wife have also owned a research facility involving German shepherds since the 1950's.

89. Dr. Love has personal knowledge of Consolidated's 4–D meat operation as he performed autopsies on dead cattle at Consolidated's Amarillo facility for Iowa Beef Processors.

90. Dr. Love was so impressed with Consolidated's 4–D meat operation, however, that he began feeding Consolidated's meat to

his German shepherds in late spring or early summer 1988.

91. After Consolidated sold its greyhound division in late 1988, Dr. Love spent approximately $2,400 on four brand new freezers so that he could buy all of Consolidated's existing inventory of 4–D meat. This supply allowed Dr. Love to feed Consolidated 4–D meat through 1991. During the time he fed Consolidated's product, Dr. Love experienced no outbreaks of clinical salmonellosis, even though some of the dogs were debilitated and were good candidates for illness.

92. As part of a controlled experiment, Dr. Love randomly sampled the 4–D meat he purchased from Consolidated. Dr. Love isolated salmonella from approximately 60% of the tubes he sampled. The serotypes of the salmonella isolated compared to those found in the meat tested by Susanne Reynolds; however, Dr. Love experienced no outbreaks of salmonellosis or viral disease among his German shepherds while feeding Consolidated's product.

93. Through the regular course of his practice of veterinary medicine, Dr. Love also examined four greyhounds from the Abilene, Kansas area which were not eating Consolidated's 4–D meat product. These greyhounds were owned by Keith Fisher and had the same clinical signs and symptoms as the greyhounds on the Reynolds and Olson farms. Mr. Fisher's dogs were diagnosed with laboratory confirmation as having distemper.

94. Dr. Love testified that vaccination does not confer complete immunity to a disease, particularly against a new strain. Dr. Love further testified that regardless of whether Ms. Reynold's greyhounds were vaccinated, their antibody titres indicated that they had no immunity to distemper.

95. Based on his experience with distemper, his personal experience with Consolidated's 4–D meat product, his review of the videotape of the greyhounds on the Reynolds farm, his review of the Kansas State University reports, and his familiarity with the dis-

ease which plagued other greyhound farms around Abilene in 1988, Dr. Love testified to a reasonable degree of veterinary probability that Consolidated's 4–D meat did not cause the disease which swept through the Reynolds and Olson greyhound farms.

### Dr. Ronald Welsh

96. Dr. Welsh is a veterinarian board certified in veterinary microbiology and preventive medicine.

97. Dr. Welsh has seen a case of distemper complicated by salmonellosis on a greyhound farm, and in that case, the 4–D meat fed to the dogs was not implicated as a cause of the distemper.

98. The explosive diarrhea experienced by the dogs on the Reynolds farm is not indicative of salmonellosis (R. at 240–41).

99. While distemper is highly immunosuppressive, salmonella has very low immunosuppressive qualities (R. at 258–269).

100. Prior to rendering his opinions in this case, Dr. Welsh reviewed the depositions of the plaintiffs, the depositions of the Kansas State University veterinarians, the videotape illustrating the clinical signs experienced by the dogs on Susanne Reynold's farm, and some of the reports generated by Kansas State University.

101. Dr. Welsh testified that the videotape of the greyhounds on the Reynolds farm shows dogs with classic signs of distemper. In fact, the hard pad described by Ms. Reynolds is pathognomonic for distemper. None of the specific symptoms shown on the videotape are common in cases of salmonellosis; signs of a central nervous system disturbance are not normally seen with salmonellosis.

102. Dr. Welsh does not believe Consolidated's 4–D meat caused the initial abortions among the brood matrons on Ms. Reynold's farm. An abortion less than 24 hours after feeding, is not very likely at all. It would take weeks for salmonella to penetrate the placental barrier.

103. Based on his knowledge and experience with distemper and salmonellosis, his

review of the testimony in this case, his review of the Kansas State University reports, and his review of the videotape of the dogs on Ms. Reynold's farm, Dr. Welsh testified to a reasonable degree of veterinary probability that distemper was the primary disease on the Reynolds and Olson farms and that salmonella did not cause the dogs to catch distemper.

### Dr. Donald Montgomery

104. Dr. Donald Montgomery is a board certified veterinary pathologist. He reviewed reports from Kansas State University, depositions of the plaintiffs and veterinarians from Kansas State University, the videotape of the greyhounds on the Reynolds farm, and pathology slides from tissues of the various dogs submitted to Kansas State University before rendering his opinion.

105. Dr. Montgomery concluded with a reasonable degree of veterinary probability that the primary disease affecting the greyhounds was a street virus infection of distemper (R. at 786–796).

106. Dr. Montgomery stated that the clinical signs exhibited by the dogs on the videotape of Ms. Reynolds farm were very characteristic of distemper.

107. Dr. Montgomery determined that there was no systemic infection of salmonellosis (R. at 761–764).

108. Dr. Montgomery testified to a reasonable degree of veterinary probability that the primary disease affecting the greyhounds in issue was distemper and that the virus was unrelated to Consolidated's 4–D meat product. He further testified that any salmonella infection present in the dogs was the type of secondary infection which typically accompanies distemper; he could not say that salmonella caused any immune suppression phenomenon (R. at 826–827, 935–936).

### CONCLUSIONS OF LAW

### Jurisdiction and Venue

1. Complete diversity exists among the parties, and the matter in controversy exceeds $50,000; therefore, the Court has jurisdiction over the parties under 28 U.S.C. § 1332.

2. Due to the fact the events giving rise to this litigation occurred in Kansas, venue is proper in the District of Kansas. 28 U.S.C. § 1391(a)(2).

### Causation

3. Plaintiffs' claims for recovery rest on four theories: negligence, strict liability, implied warranty, and express warranty.

4. Each one of plaintiffs' theories of recovery require proof of a causal link between defendant's 4–D meat product and the illness on the Reynolds and Olson greyhound farms in 1988. *Reynolds v. S & D Foods, Inc.*, NO. 91–1442–PFK, slip op. at 12, 1993 WL 61822, at *1 (D.Kan. Feb. 8, 1993).

5. Plaintiffs must come forward with expert testimony on the element of causation because the issues in this case are beyond the common knowledge of a layperson. *Reynolds,* slip op. at 4, 1993 WL 61822, at *6 (D.Kan. Oct. 8, 1992). Expert testimony produced by plaintiff must not embrace possibilities. *Savina v. Sterling Drug, Inc.,* 247 Kan. 105, 135–136, 795 P.2d 915 (1990). Instead, expert opinions must be stated with reasonable probability or as more likely than not. *Nunez v. Wilson,* 211 Kan. 443, 447–449, 507 P.2d 329 (1973).

6. Dr. Love testified to a reasonable degree of veterinary probability that Consolidated's 4–D meat did not cause the disease which swept through the Reynolds and Olson greyhound farms. Dr. Welsh testified with a reasonable degree of veterinary probability that distemper was the primary disease on the Reynolds and Olson farms and that salmonella did not cause the dogs to catch distemper. Dr. Montgomery testified to a reasonable degree of veterinary probability that the primary disease affecting the greyhounds in issue was distemper and that, the virus was unrelated to Consolidated's 4–D meat product. By contrast, Dr. Veatch could not say whether it was salmonella or distem-

670

per that was the cause of the dog's illness and death. Dr. Greene testified that as to at least some of the dogs in question, he believed that salmonella was the primary cause of their illness and death, and that the dog food was the likely source of the salmonella in the dogs. However, he qualified his testimony by indicating that he was unable to say whether salmonellosis or distemper occurred first in the dogs. He noted that the dogs suffered from a combination of salmonellosis and distemper. He concluded by saying that he could not say that it was more probable than not that if a dog showed systemic indications of salmonella, that the salmonella was the cause of the dog's illness. Based on this expert testimony, the court finds that plaintiff has failed to meet their burden of proof of a causal link between Consolidated's 4–D meat product and the illness and death of the Reynolds and Olson greyhounds.

7. In addition, not all of the greyhounds eating Consolidated's raw 4–D meat became ill. However, some of Mr. Olson's dogs fed only cooked meat became ill, despite the evidence that cooking the meat destroys the salmonella.

8. Dr. Love, who fed his dogs Consolidated 4–D meat during the same time period as Reynolds and Olson, and who continued to feed the same meat to his dogs through 1991, experienced no illness among his dogs, even though the 4–D meat he fed his dogs contained salmonella.

9. When the first of Ms. Reynolds' dogs became ill, they were diagnosed by the local veterinarian as having distemper.

10. Based on the above evidence, the court finds that plaintiff has failed to establish that it was more likely than not that there was a causal link between defendant's 4–D meat product and the illness and death of the Reynolds and Olson greyhounds. Therefore, judgment must be entered in favor of the defendant.

IT IS THEREFORE ORDERED that judgment be entered in favor of the defendant on all claims.