Kristopher M. McCROY, a minor, by and through his mother and next friend, Marie McCroy, and Marie McCroy, individually Plaintiffs,

v.

COASTAL MART, INC., and WILBUR CURTIS COMPANY, Defendants.

No. CIV.A. 99–1090–MLB.

United States District Court,
D. Kansas.

June 21, 2002.

Matthew L. Bretz, Juhnke & Bretz, Kristopher M. Wisbey, Hutchinson, KS, for Plaintiff.

Darrell L. Warta, Foulston Siefkin LLP, Wichita, KS, for Coastal Mart Inc.

Paul P. Hasty, Jr., Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, KS, Kyle N. Roehler, Walters, Bender, Strohbehn & Vaughan, P.C., Kansas City, MO for Wilbur Curtis Co.

### MEMORANDUM AND ORDER

BELOT, District Judge.

Before the court are the following:

(1) Coastal Mart's Motion for Judgment Notwithstanding the Verdict (Doc. 210) and Memorandum in Support (Doc. 213);

(2) Wilbur Curtis' Memorandum in Support of Motions for Judgment as a Matter of Law Pursuant to Rule 50 (Doc. 214);

(3) Plaintiffs' Opposition to Defendants' Motions for Judgment Notwithstanding

the Verdict (Doc. 211) and Memorandum in Support (Doc. 215);

(4) Wilbur Curtis' Reply to Plaintiff's Memorandum in Opposition (Doc. 216);

(5) Wilbur Curtis' Motion for Entry of Judgment (Doc. 232); and

(6) Plaintiffs' Opposition to Wilbur Curtis' Motion for Entry of Judgment (Doc. 233) and Memorandum in Support (Doc. 234).

The court held oral argument on May 21, 2002. For the reasons stated, the court grants defendants' motions in full.

## I. BACKGROUND

Plaintiffs filed this products liability action after 11–year old Kristopher McCroy spilled hot chocolate on his lap, resulting in severe burn injuries. Kristopher spilled the drink while riding in the back seat of his mother's conversion van. Kristopher's mother, Marie McCroy, purchased the hot chocolate from Coastal Mart and Coastal Mart dispensed it from a machine manufactured by Wilbur Curtis. Plaintiffs sued both defendants on theories of negligence, breach of implied warranty, and strict liability.[1]

Kristopher's injuries occurred on January 31, 1998, as he was traveling home from a Saturday wrestling tournament in Salina, Kansas. Before leaving Salina, Marie stopped at a Coastal Mart and purchased a 20 oz. cup of hot chocolate for Kristopher to drink on the way home. Kristopher placed a lid on the cup, and inserted a straw, before leaving the store.[2] As Marie was waiting to exit the Coastal Mart parking lot, Kristopher tested the temperature of the drink by lifting the straw out and touching it to his tongue. When Kristopher "tested" the drink a second time, a drop of hot liquid fell onto his hand causing him to flinch. As he flinched, the cup flew up into the air and turned upside down. The force of the liquid caused the lid to come off, and the full contents of the 20 oz. cup spilled onto Kristopher's lap causing first and second-degree burns.

### A. The Trial

The parties tried the case to a jury commencing August 21, 2001. Plaintiffs advanced multiple theories of liability against defendants at trial.[3] Plaintiffs'

1. Coastal Mart subsequently filed a cross-claim for indemnity against Wilbur Curtis but elected not to have its claim decided by the jury. See Doc. 226, p. 2 n. 1. Both defendants now ask the court to rule on the indemnification issue through additional post-trial motions. See Docs. 217, 218, 225, 226, 227, and 228. Today's rulings, however, render Coastal Mart's cross-claim moot, thereby resolving all claims between the parties.

2. Plaintiffs have not made any claims based upon the performance of the cup or lid, and the court admonished the jury that the cup and lid were not at issue in this case.

3. The court instructed the jury on the following claims:
 1. Negligence against Coastal Mart:
 a. Placing a "REFILLS 49¢" sticker over any warning labels which may have been on the subject machine; and

 b. Failing to have adequate and effective warnings on the machine, specifically, that the warnings were not prominent and did not warn of the injuries which could result if the hot chocolate was spilled on skin.
 2. Negligence against Wilbur Curtis Company:
 a. Failing to have adequate and effective warnings on the machine as aforesaid; and
 b. Failure to inspect and test the machine and beverage it produced to ensure that the beverage produced by the machine was reasonably safe.
 3. Breach of implied warranty against Coastal Mart:
 a. Selling a beverage which was heated to such an extreme temperature that it was not fit for the ordinary purpose for which it was sold.

claims stem, primarily, from allegations that the hot chocolate's excessive temperature rendered it unreasonably dangerous and defective and that more prominent and detailed warnings were needed to adequately warn of the specific injuries that could result.

Defendants moved for judgment as a matter of law at the close of plaintiffs' evidence and renewed their motions before the court submitted the case to the jury. The court took both motions under advisement. On August 29, 2001, the jury returned a general verdict, awarding Kristopher $75,000 in damages but apportioning only 10% fault against Coastal Mart and 20% fault against Wilbur Curtis. The jury apportioned 50% of the fault to Kristopher's mother, Marie McCroy, and 20% of the fault to Kristopher himself. *See* Doc. 204.

### B. Legal Standards

A renewed motion for judgment as a matter of law (previously judgment notwithstanding the verdict or "judgment n.o.v.")[4] under Fed.R.Civ.P. 50 " 'may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment.' " *See Aerotech Res., Inc. v. Dodson Aviation, Inc.*, 191

---

4. Breach of implied warranty against Wilbur Curtis:
 a. Producing a machine which dispensed a beverage which was heated to such an extreme temperature that it was not fit for the ordinary purpose for which it was sold.
5. Strict liability against Coastal Mart:
 a. Selling a beverage heated to such an extreme temperature that it was unreasonably dangerous and defective; and
 b. Failing to have adequate and effective warnings on the machine.
6. Strict Liability against Wilbur Curtis:
 a. Manufacturing a machine which dispensed a beverage which was heated to such an extreme temperature that it was

---

F.Supp.2d 1209, 1212–13 (D.Kan.2002) (quoting *Jackson v. City of Albuquerque*, 890 F.2d 225, 230 (10th Cir.1989)). Judgment as a matter of law is appropriate " 'only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion.' " *See id.* (quoting *J.I. Case Credit Corp. v. Crites*, 851 F.2d 309, 311 (10th Cir.1988)). " 'In determining whether the grant of a motion for judgment n.o.v. is appropriate, the court must view the evidence and indulge all inferences in favor of the party opposing the motion and cannot weigh the evidence, consider the credibility of witnesses or substitute its judgment for that of the jury.' " *Id.*

### C. Timeliness of Wilbur Curtis' Filing

Plaintiffs first argue that Wilbur Curtis' failure to file a timely Rule 50(b) motion precludes the court from considering its memorandum in support of judgment as a matter of law. Doc. 215, p. 11–12. The court entered judgment, solely on the jury's liability verdict, on August 29, 2001, the same day the verdict was returned. Doc. 205. On September 10, 2001, Coastal Mart renewed its request for judgment as a matter of law by filing a timely motion for judgment notwithstanding the verdict.

---

unreasonably dangerous and defective; and
 b. Failure to inspect and test the machine and beverage it produced to ensure that the beverage produced by the machine was reasonably safe; and
 c. Failing to have adequate and effective warnings on the machine.
Doc. 203, Instruction No. 3.

4. Although the "judgment as a matter of law" or "JMOL" terminology replaces the earlier designations of "directed verdict" and "judgment notwithstanding the verdict," the legal standards governing the analysis of such motions remain unchanged. *See Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir.1996); 1991 advisory committee notes to Fed.R.Civ.P. 50.

Doc. 210. Unlike Coastal Mart, however, Wilbur Curtis did not renew its request within the 10–day period· mandated by Rule 50(b):

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment- and may alternatively request a new trial or join a motion for a new trial under Rule 59.

Fed. R. Civ. Pro. 50(b). Although Wilbur Curtis eventually filed a "Memorandum in Support of Motions for Judgment as a Matter of Law Pursuant to Rule 50," it did so almost two months after the court had entered judgment on the liability verdict. See Doc. 214, filed October 25, 2001. Only months later, on May 7, 2002, did Wilbur Curtis file a written motion to accompany its memorandum in support. Doc. 232. Wilbur Curtis contends it was not obligated to renew its motion within the time-limits set out in Rule 50(b) because the motion was taken under advisement at trial and because the court has not yet entered a final judgment. Doc. 216, p. 2–3.

 Generally, a timely post-judgment Rule 50(b) motion is required even if the court has previously taken it under advisement.[5] See Johnson v. New York, New Haven & Hartford R.R., 344 U.S. 48, 50, 73 S.Ct. 125, 97 L.Ed. 77 (1952) (stating the rule "forbids the trial judge or an appellate court" from entering judgment in the absence of a·timely Rule 50(b) motion); see also 9A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2537, at 355 (2d ed. 1995) ("The motion must be made even though the trial court expressly has reserved judgment."). Wilbur Curtis correctly asserts, however, that without a "final judgment" the time for filing· post-judgment ·Rule 50(b) motions does·not begin to run. See O. Hommel Co. v. Ferro ·Corp., 659 F.2d 340, 353 (3rd Cir.1981)(holding that the term "judgment" .in Rule 50(b) is limited to final judgments).

·Fed.R.Civ.P. 54(b) governs the entry of final judgments in multi-claim or multi-party litigation:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, ·or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of ·decision, however designated, ·which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties,·and the order or

---

5. Although the Tenth Circuit has not directly spoken on this issue, other circuits have recognized limited exceptions to the general rule:

> [S]everal circuit courts have held that when a party makes a proper motion pursuant to Rule 50(a) before the case is sent to the jury and the trial court expressly reserved ruling on that motion, ·then the trial court can enter judgment for that party subsequent to a contrary jury verdict without the party specifically making another motion under Rule 50(b), *so long as the trial court acts within the time permitted for the filing of a Rule 50(b) motion and the opposing party still has an opportunity to request a new trial rather than the entry of judgment.* Burrows v. City of Tulsa, No. 93–5087, 1994 ··WL 232169, at *2 (10th Cir. June 1, 1994) (emphasis added) (citations omitted).

other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

The court's August 29, 2001 judgment merely reflects the jury's apportionment of liability and damages on the claims tried to the jury; it does not resolve the cross-claim for indemnity asserted by Coastal Mart against Wilbur Curtis. *See* Doc. 205. The judgment is devoid, moreover, of the express language necessary to certify it for immediate appeal. *See Oklahoma Turnpike Authority v. Bruner,* 259 F.3d 1236, 1242 (10th Cir.2001) ("[A] certification under Rule 54(b) is only appropriate when a district court adheres strictly to the rule's requirement that a court make two express determinations.").[6] Thus, the order is not a "final judgment" under Rule 54(b), and it never triggered the 10–day time-limit stated in Rule 50(b).

Because the court's August 29, 2001 entry does not constitute a "final judgment," Wilbur Curtis' request for judgment is certainly not untimely under Rule 50(b) and may, in fact, be procedurally premature. *See Aguinaga v. Morrell & Co.,* No. 83–1858, 1989 WL 47089, at *1 (D.Kan. March 21, 1989)("The court does not believe that a motion for JNOV is procedurally appropriate at this time, since the liability judgment is interlocutory."). But the rules do not prohibit parties from filing post-trial motions before the entry of a final judgment resolving all claims. *See Boehringer Ingelheim Vetmedica, Inc. v. Schering–Plough Corp.,* 106 F.Supp.2d 696, 699 (D.N.J.2000) (discussing Rules 50 and 59). By its terms, Rule 50(b) merely requires

that once "judgment" has been entered, a party has only 10 days to file the motion. *See id.* Defendants' post-trial motions are fully briefed, and the parties have presented oral argument. Rather than needlessly delay its ruling, the court will consider and rule upon defendants' motions at this time and will alter its final judgment accordingly. *See Paramount Pictures Corp. v. Thompson Theatres, Inc.,* 621 F.2d 1088, 1090 (10th Cir.1980) ("[T]he court retains the power to alter rulings until final judgment is entered on a cause."); Fed. R.Civ.P. 54(b).

## II. DISCUSSION

Under Kansas law, product liability claims are governed by the Kansas Products Liability Act ("KPLA"), codified at K.S.A. § 60–3301 *et seq.* The underlying purpose of the KPLA is " 'to consolidate all product liability actions, regardless of theory, into one theory of legal liability.' " *See Samarah v. Danek Med., Inc.,* 70 F.Supp.2d 1196, 1202 (D.Kan.1999) (quoting *Patton v. Hutchinson Wil–Rich Mfg. Co.,* 253 Kan. 741, 756, 861 P.2d 1299, 1311 (1993)). Under K.S.A. § 60–3302(c), all legal theories of recovery, *e.g.,* negligence, strict liability, and failure to warn, are to be merged into one legal theory called a "product liability claim." *See Patton,* 253 Kan. at 756, 861 P.2d at 1311 (citing *Savina v. Sterling Drug, Inc.,* 247 Kan. 105, 126, 795 P.2d 915, 931 (1990)). Thus, the KPLA's provisions "apply to actions based on strict liability in tort as well as negligence, breach of express or implied warranty, and breach of or failure to discharge a duty to warn or instruct." *Savina,* 247 Kan. at 126, 795 P.2d at 931.

---

6. First, the court must determine that the order it is certifying is a final order. *See Bruner,* 259 F.3d at 1242. Second, the district court must determine that there is no just reason to delay review of the final order until it has conclusively ruled on all claims presented by the parties to the case. *See id.*

## A. Defective Product/ Strict Liability Claims

[ 5] To succeed on their defective product claim, plaintiffs must prove: " '(1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left defendant's control.' " *Samarah v. Danek Medical, Inc.*, 70 F.Supp.2d 1196, 1202 (D.Kan.1999) (quoting *Jenkins v. Amchem Products, Inc.*, 256 Kan. 602, 630, 886 P.2d 869, 886 (1994)). With respect to the second element, Kansas courts require "that a product be *both* defective and unreasonably dangerous." *See Samarah*, 70 F.Supp.2d at 1202.

[ ] A product is considered defective under Kansas law if: (1) a flaw is present in the product at the time it is sold; (2) the producer or assembler of the product fails to adequately warn of a risk or hazard related to the way the product was designed; or (3) the product, although perfectly manufactured, contains a defect that makes it unsafe. *See Delaney v. Deere and Co.*, 268 Kan. 769, 774, 999 P.2d 930, 934, 936 (2000). Hence, a product is in a defective condition if it has a defect in manufacturing, warning, or design, and such defect existed at the time the product left the manufacturer's or seller's hands. *See* PIK 3d Civil 128.17; Doc. 203, Instruction No. 13.

Kristopher dispensed his hot chocolate from a self-service style Cappuccino machine. The machine performed apparently as Wilbur Curtis intended, and there is no evidence of a flaw in the manufacturing process sufficient to support a manufacturing defect claim against either defendant. On the contrary, all the evidence was that the Cappuccino machine functioned as designed and manufactured.

Plaintiffs seek to hold Wilbur Curtis additionally liable, however, for (1) designing the machine so as to produce an excessively hot product and (2) failing to adequately warn consumers of the severity of burns that could result. Plaintiffs seek to hold Coastal Mart liable, in turn, for selling a beverage in the same defectively-designed condition without providing adequate warning of its dangerous propensities.[7]

---

**7.** The court notes K.S.A. 60–3306, and its potential applicability to Coastal Mart as a "product seller." This section provides, in substance, that a product seller shall not be subject to liability for a defective product if the product seller establishes the following:
(1) The seller had no knowledge of the defect;
(2) the seller could not have discovered the defect while exercising reasonable care;
(3) the seller was not a manufacturer of the defective product or product component;
(4) the manufacturer of the defective product or product component is subject to service of process either under the laws of the state of Kansas or the domicile of the person making the product liability claim; and
(5) any judgment entered against the manufacturer obtained by the person making the product liability claim would be reasonably certain of being satisfied.
*See* K.S.A. 60–3306. Essentially, K.S.A. 60–3306 limits the liability of product sellers who are not manufacturers.

The evidence is undisputed that the hot chocolate Coastal Mart sold to its patrons came from Wilbur Curtis' Cappuccino machine and was made according to Wilbur Curtis' specifications. Wilbur Curtis preset the thermostat on the machine at 195 degrees, and Coastal Mart employees never adjusted the brewing temperature. Coastal Mart received no customer complaints prior to Kristopher's injuries, and the statute otherwise appears to apply.

The only question is whether Coastal Mart became the "manufacturer" of the hot chocolate merely by virtue of filling the machine with product and having it in its store for self-service use by its customers. Kansas law defines a "manufacturer" to include a "product seller who designs, produces, *makes*, fabricates, constructs or remanufactures *the relevant product* or component part of a product before its sale to a user or consumer." K.S.A. 60–3302(b) (emphasis added). Plaintiffs claim that Wilbur Curtis was the manufacturer of the machine *and* the hot chocolate, and

### 1. Design Defect

■■ Defense expert Ted Lingle testified that, according to industry standards, hot liquids including soups, teas, and coffees are generally served between 160 and 180 degrees.[8] Courtroom testing revealed that the machine in question repeatedly dispensed product well within that 160–180 degree range.[9] Plaintiffs, on the other hand, failed to present any evidence, expert or otherwise, that the temperature of the drink was actually hotter than acceptable.[10] Instead, plaintiffs asked the jury-and the court-to assume the drink was excessively hot due solely to the fact that

Kristopher was burned. The court declines to follow plaintiffs' *post hoc, ergo propter hoc* rationale. Under Kansas law, such proof is inadequate to establish a viable products liability claim. *See Samarah*, 70 F.Supp.2d at 1203; *Jenkins*, 256 Kan. at 635, 886 P.2d at 889 ("Inferring a defect from the fact of the injury . . . is unsuitable").

The court chooses to follow *McMahon v. Bunn–O–Matic*, 150 F.3d 651, 657 (7th Cir.1998), *Holowaty v. McDonald's Corp.*, 10 F.Supp.2d 1078 (D.Minn.1998), *Huppe v. Twenty–First Century Restaurants of America, Inc.*, 130 Misc.2d 736, 497

that *both* were defective. Nevertheless, Coastal Mart can certainly be said to have "made" the hot chocolate, arguably bringing it too within the meaning of K.S.A. 60–3302(b). Out of an abundance of caution, the court reluctantly proceeds on the assumption that Coastal Mart can be considered both the seller and "manufacturer" of the hot chocolate. That assumption, however, is purely one of convenience and the court in no way concludes, as a matter of law, that every seller of a product dispensed from a self-service machine automatically can be considered the "manufacturer" of that product.

8. An official trial transcript has not been requested by the parties. At the court's request, its reporter prepared an "unofficial" transcript for use in reviewing trial testimony, as well as the parties' Rule 50 motions. While the transcribed portions are undoubtedly accurate, the court has no means to cite to its unofficial version. However, based on its own notes and recollection, the court is confident that its facts are correct.

9. The machine's thermostat maintains the temperature of the water at approximately 195 degrees in a central holding tank. As hot chocolate is made, the water passes through a whipping chamber and cools. Ultimately, it is dispensed at a temperature approximately 20 degrees less than the original holding temperature.

Defendants brought the actual machine that Kristopher used into the courtroom and demonstrated its workings to the jury. When dispensed in the courtroom, the hot chocolate

ranged from 157 to 173 degrees. Although temperatures at the lower end of that margin were artificially low, defendants presented uncontroverted evidence that the machine typically dispenses product within an acceptable range. Plaintiffs presented no evidence of the hot chocolate's actual temperature, nor did they present any evidence that defendants' tests were inaccurate or not representative of the hot chocolate actually sold.

10. In their response to defendants' motions, plaintiffs claim that "the temperature of the cocoa was ten to twenty degrees higher than what Wilbur Curtis Company's expert testified should have been used." Doc. 215, p. 8–9. Plaintiffs reference Ted Lingle's deposition testimony, stating that "the water used to mix with the cocoa powder should have been on the range of between 160–180 degrees Fahrenheit." Doc. 215, p. 8 (citing Lingle deposition testimony, p. 43:20–23). Plaintiffs claim the evidence at trial established "that Wilbur Curtis used water heated to a range of 190–200 degrees Fahrenheit," and argue that the temperature of Kristopher's hot chocolate was therefore 10–20 degrees hotter than acceptable. *See id.* Plaintiffs did not attach Lingle's deposition testimony, but have obviously mischaracterized its meaning. The 160–80 degree range represents the temperature at which the hot chocolate must be mixed and served, whereas the 190–200 degree range represents the "holding temperature" of the water before the mixing process begins. There is no evidence that Kristopher's drink did not cool to acceptable limits, as normal, before being served.

N.Y.S.2d 306 (1985), and numerous parallel "hot coffee" cases reaching the same result. *See also e.g., Austin v. W.H. Braum, Inc.,* 249 F.3d 805, 806 (8th Cir.2001) (summarily affirming summary judgment where plaintiff had not presented any competent evidence from which a jury could infer that hot chocolate served at 160 to 180 degrees Fahrenheit was unreasonably dangerous); *Lamkin v. Braniff Airlines, Inc.,* 853 F.Supp. 30 (D.Mass.1994) (holding plaintiff failed to show that there was a defect in the coffeemaker that caused it to brew extremely hot coffee); *Olliver v. Heavenly Bagels,* 189 Misc.2d 125, 729 N.Y.S.2d 611 (2001) (holding coffee purchased by plaintiff from self-service station was not unreasonably hot); *Oubre v. E–Z Serve Corp.,* 713 So.2d 818, 821–22 (La. App.1998) (affirming summary judgment where plaintiff failed to refute evidence of standard industry coffee temperatures and did not present any evidence that her cup of coffee was hotter than normal).

In *Huppe,* the court concisely stated the basic rationale, which *McMahon, Holowaty,* and the other cited cases appear to have followed:

> Since plaintiffs clearly intended to purchase hot coffee and since coffee is customarily served and intended to be consumed as a hot beverage, plaintiffs must present evidentiary facts establishing that the coffee served by defendant was defective or unreasonably dangerous by virtue of being hotter than it should have been. Plaintiffs have wholly failed to meet this burden. They merely make the conclusory allegation that the coffee was "super heated" and "too hot" .... Since plaintiffs have failed to show that the coffee was so hot that it exceeded the reasonable or customary standards for such a product, there is no evidence upon which a trier of fact could conclude that the coffee was defective, unreasonably dangerous, or negligently served.

497 N.Y.S.2d at 308. To rule otherwise would ignore the fact that hot chocolate is manufactured, marketed, sold, and consumed as a "hot" product. Unlike coffee, which must be brewed at a certain temperature to properly extract flavor from the grounds, there is apparently no standard temperature at which hot chocolate must be whipped. Nevertheless, a certain degree of heat is required to ensure that the flavored powder properly dissolves during the mixing process. More importantly, a certain degree of heat is required to ensure that the hot chocolate is served "hot," as expected by the consumer. The fact that Kristopher's hot chocolate was hot enough to cause injury when not properly handled does not necessarily mean that it was defectively designed or negligently served. *See Huppe,* 497 N.Y.S.2d at 308. Nor must every potentially injury-inducing product be deemed inherently defective.

■] Plaintiffs correctly rely upon the consumer expectations test of Restatement (Second) of Torts § 402A comment i as the standard for analyzing design defects in Kansas. *See Delaney,* 268 Kan. at 772, 999 P.2d at 934. Under that test, a product is "unreasonably dangerous" only if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." *See id.* In conformance with that standard, both plaintiffs testified that, although they knew the hot chocolate was hot, they did not realize that it was capable of producing second-degree burns. But even though the consumer expectations test is the proper standard, it cannot be viewed as the sole litmus test for a defectively designed product. *See Jenkins v. Amchem Prods., Inc.,* 256 Kan. 602, 624, 886 P.2d 869, 883 (1994) ("We question whether there is such a thing as a strict liability claim based on a 'pure consumer expectations test.' "). Doing so escapes the fact that, under Kansas law, a product must be *both* defective and

unreasonably dangerous to trigger liability on the part of a retailer or manufacturer.[11] See Delaney 268 Kan. at 793, 999 P.2d at 946 ("A plaintiff must show that the product is both in a defective condition and dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it, with the ordinary knowledge common to the community as to its characteristics."); Jenkins, 256 Kan. at 635–36, 886 P.2d at 889–90 (holding that specific defect must be established to prove strict liability claim).

That said, the court need not decide whether a second-degree burn constitutes " 'harm to an extent beyond that contemplated by an ordinary consumer' who knows that hot liquids burn." See McMahon v. Bunn–O–Matic, 150 F.3d 651, 657 (7th Cir.1998). For even if the court were to assume that the machine and the hot chocolate it produced were "unreasonably dangerous," the record does not permit a reasonable juror to conclude that they were defectively designed due to the complete absence of evidence that the hot chocolate's temperature was actually excessive. See id.

## 2. Warning Defect

] In Kansas, a failure to warn claim, whether couched in negligence or strict liability, employs the same measure of reasonableness under the circumstances. See Brand v. Mazda Motor Corp., 978 F.Supp. 1382, 1388–89 (D.Kan. 1997) (citing e.g., Wheeler v. John Deere Co., 935 F.2d 1090, 1099 (10th Cir.1991);

Richter v. Limax Intern., Inc., 822 F.Supp. 1519, 1521 (D.Kan.1993), rev'd on other grounds, 45 F.3d 1464 (10th Cir. 1995); Miller v. Lee Apparel Co., 19 Kan. App.2d 1015, 1029, 881 P.2d 576, rev. denied, 256 Kan. 995 (1994)). Under Kansas law, " '[a] product may be perfectly manufactured and meet every requirement for its designed utility and still be rendered unreasonably dangerous through failure to warn of its dangerous characteristics.' " See Samarah v. Danek Med., Inc., 70 F.Supp.2d 1196, 1204 (1999) (citing Mays v. Ciba–Geigy Corp., 233 Kan. 38, 57, 661 P.2d 348, 363 (1983)). Consequently, a product may be defective if there is either a complete failure to warn of a particular risk or if the warnings given are insufficient. See Brand, 978 F.Supp. at 1389.

Defendants claim the machine in question had at least one red warning label, which was furnished by Wilbur Curtis, stating "Warning Hot Liquid Handle With Care." Coastal Mart claims to have added an additional blue warning sticker, stating "Hot Coffee Contact With Skin May Result in Injury." Plaintiffs dispute whether either warning was actually on the machine and claim that, even if they were, defendants failed to have adequate and effective warnings because the warnings were not prominent and did not warn of the specific injuries that could result if the hot chocolate was spilled on skin. Additionally, plaintiffs claim that a 49¢ refill sticker was covering any warning labels that were on the machine, eliminating any warning altogether. Neither plaintiff,

---

11. The court knows of only one case, decided by the Ohio Court of Appeals, where a similar claim was allowed to proceed without evidence of a specific defect. See Nadel v. Burger King Corp., 119 Ohio App.3d 578, 695 N.E.2d 1185, 1191 (1997) (holding the fact that coffee caused second-degree burns "is sufficient by itself to raise a factual issue whether the coffee was unreasonably hot"). However, Kansas' products liability law dif-

fers from Ohio's, which permits recovery if either the design is defective or the consumer is surprised by the risks. See McMahon v. Bunn–O–Matic, 150 F.3d at 657 ("The either-or nature of the liability standard in Ohio led the court in Nadel to hold that questions about consumers' understanding of coffee's propensity to burn present a triable issue on the consumer expectations issue.").

however, recalled seeing the 49¢ refill sticker and neither could testify one way or the other as to what warnings were in view on the day of the incident. The court casts aside, for now, the issue of the 49¢ sticker and concludes that defendants had no duty to warn.

■■■] Kansas law does not recognize a duty to warn when the user already knows of the danger:

> In any product liability claim any duty on the part of the manufacturer or seller of the product to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend:
>
> . . .
>
> (C) to warnings, protecting against or instructing with regard to dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product.

K.S.A. 60–3305; *see also Delaney v. Deere & Co.*, 268 Kan. 769, 781–82, 999 P.2d 930, 940 (2000) (holding K.S.A. 60–3305(c) applies only to claims premised upon a duty to warn). Plaintiffs rely upon *Brand v. Mazda Motor Corp.*, 978 F.Supp. 1382, 1389 (D.Kan.1997) for the proposition that "there *is a duty to warn* when, although a minimal danger is known, no serious injury is apparent or generally known." *See* Doc. 215, p. 3 (emphasis in original).[12] Although both plaintiffs admit to knowing that hot chocolate will burn, they claim not have known the severity of injuries that could result if the product was spilled.

The plaintiff in *Brand* lodged a similar complaint against the manufacturers of his wife's vehicle. Plaintiff's wife, Ann Brand, was killed when the 1991 Mazda Protege she was driving collided with another vehicle. Brand was not wearing her manual lap belt at the time of the accident, although she regularly wore it "for safety" and warned others to do the same. Because she knew the belt was required for her own safety, defendants argued they had no duty to warn her of the specific risks involved. In an attempt to avoid summary judgment based on Brand's actual knowledge, plaintiff argued that defendants had a duty to specifically warn of the possibility of severe liver and abdominal injuries. The court, however, deemed

---

**12.** In addition to *Brand,* plaintiffs rely upon several cases from the state of New York to support their claim that defendants had a duty to warn of specific injuries. *See e.g., Anderson v. Hedstrom Corp.,* 76 F.Supp.2d 422 (S.D.N.Y.1999); *Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998); *Cooley v. Carter–Wallace Inc.,* 102 A.D.2d 642, 478 N.Y.S.2d 375 (1984). The cases cited involve the failure to adequately warn of injuries resulting from the use of a trampoline, a hair removal product, and a meat grinder. Plaintiffs have failed to square those cases, however, with the hot-coffee case considered by the New York court in *Huppe. See* 497 N.Y.S.2d at 308–09 (holding the hotness of the coffee was such an essential and intended attribute of the product that defendant had a duty to warn of its temperature only if it exceeded the reasonable range of temperature for such a product). Although the court has considered the cases cited, it does not find them particularly persuasive in light of *Huppe,* or applicable to Kansas law. Similarly, the various premises liability cases cited from other jurisdictions fail to lend much weight to plaintiffs' position. *See e.g., Andrews v. U.S.,* 130 F.Supp.2d 815 (S.D.Miss.2000); *Ellis v. Target Stores, Inc.,* 842 F.Supp. 965 (W.D.Mich.1993); *Riddle v. McLouth Steel Products Corp.,* 440 Mich. 85, 485 N.W.2d 676 (1992); *Quinlivan v. Great Atlantic & Pacific Tea Co., Inc.,* 395 Mich. 244, 235 N.W.2d 732 (1975). To the extent the court considers legal authority from other jurisdictions, it favors those cases addressing nearly identical hot-coffee-spill scenarios. *See e.g., McMahon,* 150 F.3d at 653–57; *Holowaty,* 10 F.Supp.2d at 1084–85; *Huppe,* 497 N.Y.S.2d at 309.

plaintiff's analysis "too narrow." *Brand,* 978 F.Supp. at 1389.

The *Brand* court aptly articulated the difficulties in holding manufacturers, in particular, liable for failing to warn of specific injuries: ·

> If such were the law, not only would the actual knowledge exception rarely apply, but· manufacturers would face the unreasonable and probably impossible burden of warning consumers about every conceivable injury that could result from use and misuse of its product.

978 F.Supp. at 1389. Although the court noted that additional detailed warnings explicitly identifying injuries or risks may be appropriate "[i]n some circumstances where no serious injury is apparent from use or misuse," the court found that the possibility of severe injuries from not wearing seatbelts was a matter of common knowledge. *Id.* Similarly here, the fact that hot liquids will burn if spilled on skin is a matter of common knowledge. That plaintiffs did not appreciate the degree of potential injury is unfortunate, but. does not translate into a duty to warn when the basic danger is already known.

The court in *Holowaty v. McDonald's Corp.,* considered and rejected plaintiffs' precise argument in a related hot-coffee-spill case:

> Although a manufacturer has a duty to warn of reasonably foreseeable dangers, there is no duty to warn if "the user knows or should know of potential danger." Thus, where the alleged danger is open and obvious, Minnesota courts do not require a warning. As one Minnesota court explained, "There is certainly no usual duty to warn the purchaser that a knife or an axe will cut, a match will take fire, dynamite will explode, or a hammer may mash a finger." Because the dangers associated with a knife, axe, match and dynamite are obvi-

ous, there is no reason to think a warning would make the products any safer.

The Court holds that the risk of burns resulting from spilled coffee presents the same kind of obvious danger. The average person in the community knows that hot coffee can cause burns. Plaintiffs, in fact, admit that they were aware of the danger.

Plaintiffs contend defendants nevertheless had a duty to warn because the risk of injury was more severe than a reasonable consumer would anticipate. Plaintiffs thought spilled coffee would only cause reddened skin and allege that reasonable consumers anticipate only minor burns. Because the public is not aware of the possibility of severe burns, plaintiffs argue defendants had a duty to warn. In essence, plaintiffs contend that a duty to warn exists if the foreseeable risk of injury is more severe than a reasonable person would anticipate, even if the risk of a less severe injury of the same type is open and obvious.

The Minnesota courts have not considered plaintiffs' argument. If presented with the issue, the Court believes that the Minnesota Supreme Court would reject plaintiffs' argument. Minnesota courts have repeatedly held that there is no duty to warn of open and obvious dangers. An alleged difference in the anticipated degree of danger does not make the risk· associated with use of the product any less obvious.

The discussion in *Moss v. Crosman Corp.,* 136 F.3d 1169 (7th Cir.1998) is instructive. In *Moss,* the parents of a child killed by a BB gun alleged that the BB gun was defective due to inadequate warnings. The district court held that the BB gun was not unreasonably dangerous because the average person "is aware of the danger that a projectile

fired from [a BB gun] could hit a person and cause serious injury."

On appeal, the *Moss* plaintiffs made the same argument plaintiffs advance here. Although they agreed that the average person is aware of the potential for serious injury, the plaintiffs in *Moss* argued that the same persons were unaware that a BB gun could cause death. The Court rejected the argument because the type of injury the average consumer would anticipate and the injury that resulted were different in degree, not in kind. The Court explained: "the fact that the gun caused death rather than serious injury (i.e. the loss of an eye or a flesh wound) ... does not transform the fundamental nature of the injury."

The same analysis applies to the case at bar. The average consumer understands that coffee is hot, and that it will cause burns if it comes into contact with skin. The danger of burns remains apparent, even if the degree of injury is more serious than contemplated. Because the temperature of the coffee plaintiffs purchased was no hotter than is typically served in restaurants, the Court holds that defendants did not have a duty to warn plaintiffs that the coffee could cause severe burns if spilled.

10 F.Supp.2d 1078, 1084–85 (D.Minn.1998) (internal citations and footnotes omitted).

Moreover, as the Seventh Circuit recognized just prior to the *Holowaty* decision, there are inherent difficulties in issuing such a warning, even if the duty were found to exist. *See McMahon v. Bunn–O–Matic Corp.,* 150 F.3d 651, 656–57 (7th Cir.1998). Even if the court were to assume that most consumers do not realize a 20 oz. hot-chocolate-spill can result in severe injury, how, precisely, can that information be conveyed? At some point, the detailed enumeration of every possible injury would lose its effectiveness to fine print, and retailers and manufacturers cannot be expected to deliver a "medical education" along with every hot beverage purchased. *See McMahon,* 150 F.3d at 656.

Additionally, the court sees no reason why such a duty, if imposed, would be limited to manufacturers and retailers of hot chocolate sold at mini-marts. Such a rule would also likely extend to coffee and all other hot liquids typically served between 160 and 180 degrees. Application of such a strict duty to warn would lead to outlandish results. If Kristopher's beverage was purchased at a restaurant instead of a convenience store, for example, would the court require his server to apprize him of the possibility of receiving second-degree burns before bringing his drink to the table? The better approach, it seems, is to trust consumers to weigh the risks associated with enjoying their favorite hot beverage, without holding its maker liable when accidents occur.

Although it is clear that plaintiffs did not fully appreciate the risks, the court simply does not believe that Kansas law imposes a duty upon manufacturers or retailers to give warnings in the detail plaintiffs contemplate. Rather, as the court found in *McMahon,* "[i]t expects consumers to educate themselves about the hazards of daily life—of matches, knives, and kitchen ranges, of bones in fish, and of hot beverages—by general reading and experience, knowledge they can acquire before they enter a mini mart to buy [hot chocolate] for a journey." *McMahon v. Bunn–O–Matic,* 150 F.3d at 656–57 (interpreting Indiana law). Otherwise, "any person severely injured by any product could make a claim, at least as plausible as [plaintiffs',] that they did not recognize the risks *ex ante* as clearly as they do after the accident." 150 F.3d at 656.

While the court is certainly sympathetic to Kristopher's injuries, the fact remains that they would not have occurred but for his carelessness and his mother's inattentiveness. "The sad reality is that when a small child is left unattended and within reach of potentially harmful items such as knives, appliances, or containers of hot food or liquids, accidental injuries can occur." *Kelley · v. Rival Mfg. Co.*, 704 F.Supp. 1039, 1044 (W.D.Okla.1989). This court is confident, however, that Kansas law would not make defendants "insurers through the tort system of those harms, even grievous ones, that are common to the human existence." *McMahon*, 150 F.3d at 659.

## B. Negligence Claims

Plaintiffs assert identical strict liability and negligence claims based on the duty to provide more prominent and detailed warnings. The court's strict liability analysis applies equally to plaintiffs' negligence claims, and forecloses recovery under either theory based upon defendants' alleged failure to adequately warn. *See Brand*, 978 F.Supp. at 1389 (" 'There is no duty to warn of dangers *actually known* to the user of a product, regardless of whether the duty rests in negligence ... or on strict liability.' "). Additionally, however, plaintiffs assert an "active negligence" claim against Coastal Mart for placing a 49¢ refill sticker over any warnings on the machine and an additional negligence claim against Wilbur Curtis for failure to test and inspect the subject machine.

### 1. 49¢ Sticker

A substantial amount of time was spent at trial speculating as to whether a yellow 49¢ sticker was covering the warnings on the machine on the day of Kristopher's

injuries. Plaintiffs assert that there is "more than adequate testimony from which the jury could conclude that ... any warning which was present was covered by the 'refills' sticker." Doc. 215, p. 9. After further review of the trial testimony, however, it is apparent that the yellow refill sticker is nothing but a "yellow herring."

 It is important to note, once again, that Kristopher's injuries occurred on January 31, 1998. Lynnette Baker, who was actually working at the Coastal Mart at that time, testified that she didn't ever see a 49¢ refill sticker covering the Cappuccino machines while she was there. Instead, plaintiffs rely upon the testimony of Kathleen Ingram, who testified that the "refill" stickers came out when the 1998 advertising matrix was introduced between December 1997 and February 1998.[13] Plaintiffs link her testimony to that of Peggy Tersiner, who testified that she removed a yellow refill sticker from one of Coastal Mart's two Cappuccino machines just after she started working at the store in January 1999. Plaintiffs argue that evidence is sufficient for the jury to infer that the sticker could have been on the machine Kristopher used the day of the incident. Even if the jury were to make that inferential leap, however, plaintiffs presented absolutely no evidence from which the jury could conclude that the refill sticker was actually covering the warnings on the machine. Indeed, there was no evidence presented as to which machine the sticker was on, where the sticker was located, or from where it was removed.

Absent some evidence that the 49¢ refills sticker was actually covering the warnings on the subject machine, no reasonable juror could conclude that Coastal Mart committed a negligent act. Although

**13.** On cross-examination, Kathleen Ingram testified that she might "have [her] years confused," and that the advertising matrix could have come out in January 1999, not January 1998.

the court cannot weigh the evidence presented, the court finds that there can only be one conclusion as to the proper judgment. For even if the court were to assume that Coastal Mart covered up existing warnings, its actions cannot be deemed negligent where there was no duty to warn.[14]

### 2. Failure to Inspect and Test

Kansas law recognizes a manufacturer's duty to inspect and test. *See Lindquist v. Ayerst Labs., Inc.,* 227 Kan. 308, 319–20, 607 P.2d 1339, 1350 (1980) (quoting 1 Hursh & Bailey, American Law of Products Liability 2d § 2:29 (1974)):

> The rule is that a manufacturer has a duty to make such tests and inspections, during and after the process of manufacture, as should be recognized as being reasonably necessary to secure the production of a safe product; and a manufacturer who negligently fails to use reasonable care in making such tests and inspections, *and thereby produces a defective article* which causes damage while being put to an ordinary, anticipated use, is liable for such damage.

(emphasis added). Amir Hashimi, Wilbur Curtis' company representative, testified that each of Wilbur Curtis' machines are tested before they leave the factory to make sure they are functioning correctly. Doc. 208, p. 8, ln. 18–p. 9, ln. 7; p. 32, lns. 20–23. Hashimi admitted that he didn't know of any testing done on the temperature of the dispensed product or the temperatures at which a person would suffer burns as a result of contact with the skin. Doc. 208, p. 20, ln. 3–p. 21, ln. 2. In this case, however, there is no evidence of a defect in the product, either in design or warning, that additional testing could have ameliorated.

] ·Wilbur·Curtis admits that it manufactures machines that dispense hot beverages, and that the beverages are dispensed at a temperature that will burn if spilled. *See* Doc. 203, Instruction No. 5. Liability is premised not on the fact of injury alone, however, but upon the manufacturer's failure to take reasonable steps to discover a defect in its product before a defective condition causes injury. Having already found that plaintiffs failed to establish sufficient evidence of a defect, the court also finds insufficient evidence for a jury to impose liability for a failure to inspect or test.

### C. Breach of Warranty Claims

Pursuant to K.S.A. 84–2–314(2)(c), for a product to be merchantable, it must be "fit for the ordinary purposes for which such goods are used." " 'To establish a breach of the implied warranty of merchantability under K.S.A. 84–2–314(2)(c) a buyer must show the goods were defective and the defect existed at the time of the sale.' " *See Miller v. Lee Apparel Co., Inc.,* 19 Kan.App.2d 1015, 1031, 881 P.2d 576, 588 (1994) (quoting *Black v. Don Schmid Motor, Inc.,* 232 Kan. 458, Syl. ¶ 4, 657 P.2d 517 (1983)). " 'The Kansas courts have equated the concept of fitness for ordinary purposes with the concept of defect used in tort law.' " *See id.;* K.S.A. 84–2–314 Kansas Comment, 1996 n. 4.

Again, plaintiffs have failed to present any evidence that Kristopher's hot chocolate was defective or that its temperature rendered it unfit for human consumption at the time it was sold. Like their strict liability and negligence claims, plaintiffs' breach of warranty claims must also therefore fail. *See also Greene v. Boddie–Noell Enter., Inc.,* 966 F.Supp.

---

**14.** Even if there were some duty to warn, plaintiffs' negligence claim would likely fail for lack of causation. This court would be hard-pressed to hold Costal Mart liable for covering warnings that plaintiffs view as inadequate.

416, 419 (W.D.Va.1997) (holding customer failed to establish that coffee was unreasonably dangerous under Virginia law, as required to recover on failure to warn and implied warranty of merchantability claims).

## III. CONCLUSION

Defendants' renewed motions for judgment as a matter of law are granted in full. A final judgment on the merits shall be entered in defendants' favor, contemporaneously with this written order.

IT IS SO ORDERED.